**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

TRIDENT STEEL CORPORATION,       )
                                 )
            Plaintiff,           )
                                 )
      v.                         )          Case No. 4:20-CV-932-SPM
                                 )
MARK SIFFIN,                     )
                                 )
            Defendant.           )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss Second Amended Complaint for Failure to State a Claim for Relief. (Doc. 36). The motion has been fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 12). For the following reasons, the motion will be granted in part and denied in part.

### I.    PROCEDURAL BACKGROUND

Plaintiff Trident Steel Corporation ("Trident") initiated this action by filing a Complaint in the Circuit Court for St. Louis County in January 2020, and Defendant Mark Siffin removed the action to this Court in July 2020. (Doc. 1). On July 21, 2020, Trident filed its First Amended Complaint. (Doc. 7). Siffin shortly thereafter filed Suggestion of Bankruptcy and Notice of Automatic Stay, stating that pursuant to the filing of a petition in the United States Bankruptcy Court for the District of Delaware by the parent company of MDC Energy LLC, the instant action was automatically stayed. (Doc. 11). On July 29, 2020, the Court entered a stay of proceedings in this Court pending the Bankruptcy Court's decision (Doc. 13). This case remained stayed until November 17, 2021, when Siffin filed his Answer. (Doc. 16). With leave

of Court, Trident filed its Second Amended Complaint on May 27, 2022. (Doc. 35). Siffin has now filed a motion to dismiss the claims in the Second Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    FACTUAL BACKGROUND[1]

On a few occasions in the spring of 2019, Plaintiff Trident Steel Corporation ("Trident") sold pipe to MDC Energy, LLC (dba MDC Texas Energy) for use in MDC Energy's oil wells. 2d Am. Compl. ¶¶ 6-9. Trident delivered the orders and issued invoices in a timely manner. *Id.* ¶ 9. In July 2019, Trident  requested updates on the outstanding balances for the goods but received no reply. *Id*. In mid-August 2019, Trident's president (Kevin Beckmann) called Defendant Mark Siffin, then Chief Executive Officer of MDC Energy, to discuss the outstanding payments. *Id.* ¶¶ 2, 10. Beckmann informed Siffin that if the invoices were not paid, Trident would file mineral liens on MDC Energy's oil wells that were utilizing Trident's pipe. *Id.* ¶ 11.

In their August 2019 call, Siffin informed Beckmann that he was expecting MDC Energy to receive a multi-million-dollar cash infusion from an investor group in Canada and that upon receipt of those funds, MDC Energy would send Trident $150,000 to $200,000 by mid-September 2019. *Id.* ¶ 13. This promise was conditioned on Trident not filing or perfecting mineral liens on any MDC Energy wells, likely because if such liens were in place, the expected cash infusion would not materialize. *Id.* ¶¶ 13-14. Beckmann relied on Siffin's statement and agreed that Trident would not file or perfect mineral liens at that time. *Id.* ¶ 15.

In August and September 2019, numerous phone calls took place between Siffin and Beckmann in which Siffin reiterated the promise that Trident would be paid. *Id.* ¶ 18. Trident did

---

[1] These facts are taken from the Second Amended Complaint, with the Court treating all factual allegations as true for purposes of the instant motion and drawing all reasonable inferences in favor of the Trident.

not receive payment in mid-September as Siffin had promised. *Id.* ¶ 19. On or around September 27, Beckmann informed Siffin that if Trident was not paid, Trident would file mineral liens against MDC Energy. *Id.* ¶ 20. In response, Siffin stated that Trident would be paid in full on or before October 21, 2019, but again stated that the payment would be made only if Trident did not file or perfect mineral liens. *Id.* ¶ 21. Relying on Siffin's statement, Beckmann told Siffin that Trident would not file or perfect mineral liens at that time. *Id.* ¶ 23. Trident did not receive payment from MDC Energy by October 21, 2019, or any time after. *Id.* ¶¶ 25-26. On November 1, 2019, Trident sent a demand letter informing Siffin that if MDC Energy did not receive immediate payment, it would file a lawsuit and pursue lien rights. *Id.* ¶ 27. Trident did not receive a response. *Id.* ¶ 28.

On November 8, 2019, MDC Energy filed a voluntary bankruptcy petition. *Id.* ¶ 43. On November 13, 2019, MDC Energy filed a list of creditors in the bankruptcy court, and notice of the bankruptcy was mailed to MDC Energy's creditors on November 14, 2019, at the addresses provided by MDC Energy. *Id.* ¶¶ 50-51. Although MDC Energy knew Trident's business address, MDC Energy did not include that address on the creditor list, but instead provided a post office box address that Trident had not used since 2016 and that Trident had informed its customers was no longer in use. *Id.* ¶¶ 52-53.

In the Second Amended Complaint, Trident asserts two counts against Siffin. In Count I ("Fraudulent Misrepresentation"), Trident alleges that Siffin's representations regarding when Trident would be paid were fraudulent misrepresentations that damaged Trident. When Siffin told Trident that MDC Energy was going to pay Trident, Siffin knew that MDC Energy did not intend to pay Trident, and Siffin was attempting to lull Trident into delay and possibly prevent Trident from exercising its legal lien rights. *Id.* ¶¶ 30-31. Trident did not know, and had no

reason to know, that Siffin's statements were untrue, and it was reasonable for Trident to rely on those representations because oil and gas well operators frequently request extensions on payment terms for myriad reasons. *Id.* ¶¶ 35-36. For three of the oil wells at issue, the six-month time limit for filing mineral liens expired between October 29, 2019, and October 30, 2019. *Id.* ¶¶ 32-33. As to those three oil wells, Siffin's misrepresentations had the effect desired by Siffin, in that Trident relied on Siffin's statements and did not file liens on the three oil wells before the six-month filing deadline expired. *Id.* ¶ 34. If Trident had filed and perfected the mineral liens, it would have been a secured creditor. *Id.* ¶ 37.

In Count II ("Negligence"), Trident alleges that Siffin was negligent in listing an incorrect address for Trident in MDC Energy's list of creditors in its bankruptcy filing, thereby causing a delay in notice that rendered Trident unable to perfect its mineral lien rights as to six oil wells before the time to do so expired. Between November 13, 2019 and November 15, 2019, Trident filed mineral liens on six wells owned by MDC Energy to which Trident had shipped pipe. *Id.* ¶ 42. Although those liens were filed after the bankruptcy and were thus ineffective to seize any property, Trident could have nevertheless perfected and preserved its mineral lien rights with respect to the six oil wells because 11 U.S.C. Section 542(b) permits a creditor with unperfected lien rights to perfect their lien rights by filing notice in bankruptcy court before the statutory time limit for perfecting the liens expired. *Id.* ¶¶ 44-45. For these six wells, Trident would have had to file notice in the bankruptcy court no later than November 13, 2019 (for one well), November 16, 2019 (for two wells), December 1, 2019 (for one well), and two on December 10, 2019 (for two wells). *Id.* ¶ 46. However, because Siffin negligently listed an incorrect address for Trident in its November 13, 2019, list of creditors, Trident did not receive timely notice of the bankruptcy, was unable to perfect its mineral lien rights before the time limit

to do so expired, and did not become a secured creditor. *Id.* ¶¶ 55-58.

### III. LEGAL STANDARD

For a claim to survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all of the factual allegations in the complaint, but it need not accept the legal conclusions. *Iqbal*, 556 U.S. at 678. The Court must make "all reasonable inferences in favor of the nonmoving party." *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019). Additionally, "Where the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." Benton v. Merrill Lynch & Co., 524 F.3d 866, 870 (8th Cir. 2008) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997)).

### IV. DISCUSSION

Because this Court's jurisdiction in this case is based on diversity of citizenship, state law governs the substantive issues in this case. *See, e.g.*, *Am. Home Assur. Co. v. Pope*, 591 F.3d 992, 998-99 (8th Cir. 2010) ("In a diversity action, such as this, we use state substantive law to govern our analysis.") (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The parties agree that Missouri provides the law that governs Trident's fraudulent misrepresentation and negligence claims. In interpreting state law, a federal court "is bound by the decisions of the state's highest court." *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006) (quoting *Eichenwald v. Small*, 321 F.3d 733, 736 (8th Cir. 2003)). "When a state's highest court has not decided an issue, it is up to this court to predict how the state's highest court would

resolve that issue.'" *Id.* (quoting *Continental Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006)). In making that determination, the decisions of intermediate state appellate courts are persuasive authority. *Id.*

### A.  Count I: Fraudulent Misrepresentation

Under Missouri law, the elements of a fraudulent misrepresentation claim are "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131-32 (Mo. 2010). "A plaintiff's failure to establish any one of the essential elements of fraud is fatal to recovery." *Id.* at 132. In Missouri, an unkept promise can only constitute fraudulent misrepresentation when "it is accompanied by a present intent not to perform." *Roth v. Equitable Life Assur. Soc. of U.S.*, 210 S.W.3d 253, 259 (Mo. 2006)).

Trident's fraudulent misrepresentation claim must satisfy the heightened pleading rules of Federal Rule of Civil Procedure 9(b). *See, e.g.*, *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013). Under Rule 9(b), "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement of Rule 9(b), the plaintiff must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Frietas*, 703 F.3d at 439 (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)).

Siffin argues that Trident's fraudulent misrepresentation claim fails for two reasons: (1) Trident did not plausibly allege that it relied on Siffin's promise to pay; and (2) Trident did not plausibly allege that it had the right to rely on Siffin's promise to pay.

### 1. Reliance

Siffin first argues that Trident did not plausibly allege that it relied on Siffin's promises of payment. Siffin argues that he had previously made promises to Trident that MDC Energy would pay, that only a naïve and unsophisticated supplier would have relied on Siffin's September 27 promise to pay by October 21, and that Trident is not a naïve or unsophisticated supplier. Siffin argues that as a matter of common sense, the Court should reject as implausible the allegation that Trident relied on Siffin's statements.

The Court finds this argument unpersuasive. Trident alleges that "oil and gas well operators frequently request extensions on payment terms for myriad reasons," 2d Am. Compl. ¶ 36, and that Trident "did not know, and did not have reason to know, that Siffin's statements [regarding MDC Energy's intent to pay Trident] were untrue," *id.* ¶ 35. Taking these factual allegations as true, which the Court must, the Court finds plausible Trident's allegation that it relied on Siffin's promises that Trident would be paid in full if it did not file or perfect mineral liens.

### 2. Right to Rely

Siffin's argues that Trident has not plausibly alleged that it had a right to rely on Siffin's alleged misrepresentations for two independent reasons.

First, Siffin argues that when Trident learned on October 21 that MDC Energy was not going to pay as promised, Trident still had time to perfect liens on the three wells, because the deadlines did not expire until October 29 and October 30, yet it did not do so. Siffin argues that

any continued reliance on Siffin's unfulfilled promise after October 21 was not justified. In its opposition, Trident points out Texas law requires that a lienholder must serve written notice on a property owner at least ten days before filing the lien. *See* Tex. Prop. Code § 56.021(b). Thus, to timely file the liens on these wells, Trident would have had to serve notice of the liens by October 19 or October 20, at which time Trident was still awaiting the promised payment. Thus, Trident argues, it could not have complied with the ten-day notice period before its lien rights expired.

The Court agrees with Trident that Trident has plausibly alleged a right to rely on Siffin's promises to pay and that Trident was justified in waiting until before the promised pay date had passed before serving notice of the liens. The Court is unpersuaded by Siffin's argument that Trident could have served notice of the liens before the October 21 payment deadline arrived, because Siffin conditioned payment only on Trident holding off on "filing" liens, not on Trident's holding off on "serving notice" of liens to be filed. Based on the facts as alleged, it is plausible that Trident would have believed that serving notice of a lien by October 19 or October 20 would have had the same effect as filing a lien and would have led to MDC Energy not fulfilling its promise to pay on October 21.

Second, Siffin argues that Trident had no right to rely on Siffin's statements because Siffin's statements concerned the expected actions of a third party. In Missouri, "[s]tatements and representations about expectations and predictions for the future, especially regarding future actions of an independent third party, do not constitute fraudulent misrepresentation." *Ryann Spencer Grp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 290 (Mo. Ct. App. 2008). Siffin argues that Siffin's statement that he was expecting MDC Energy to receive a multi-million-dollar cash infusion from an investor group in Canada and that upon receipt of those funds, MDC

Energy would pay Trident was simply a statement about regarding the future actions of the Canadian group, an independent third party. In response, Trident points out that the statement about the Canadian investor group was only mentioned once by Siffin, in one phone call in mid-August, and was only one misrepresentation out of many. Trident notes that it does not allege that Siffin repeated the statement about the Canadian investors every time he promised MDC Energy would pay Trident's invoices.

The Court finds Siffin's argument unpersuasive. Even if some of the alleged misrepresentations, standing on their own, might not be actionable because they were based on the expected future actions of the Canadian investor group, the Second Amended Complaint also contains allegations of misrepresentations that did not involve that third party. Trident alleges that Siffin made several false representations regarding MDC Energy's intent to pay Trident, and there is nothing in the Second Amended Complaint to indicate that all of those representations involved statements regarding the expectations of the actions of the Canadian investor group. Trident has plausibly alleged it had a right to rely on those false representations.

For all of the above reasons, the Court finds that Trident has stated a claim for fraudulent misrepresentation, and Siffin's motion to dismiss Count I will be denied.

### B. Count II: Negligence

To establish a cause of action for negligence under Missouri law, "the plaintiff must establish that (1) the defendant had a duty to the plaintiff; (2) the defendant failed to perform that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *McComb v. Norfus*, 541 S.W.3d 550, 554 (Mo. 2018) (quoting *Peters v. Wady Indus., Inc.*, 489 S.W.3d 784, 793 (Mo. 2016)). Siffin argues that Trident's negligence claim should be dismissed for two reasons: (1) there is an absolute privilege that shields Siffin from liability based on statements

offered in the course of judicial proceedings, and (2) Trident's theory of causation is flawed.

       *1. Absolute Privilege*

Defendant argues that Trident's negligence claim fails because it is based on statements made in the course of a judicial proceeding (the bankruptcy filing), as part of that proceeding, and the absolute litigation privilege shields participants in litigation from civil actions based on such statements. The parties agree, for purposes of the instant motion, that the common law of Delaware, where MDC's bankruptcy petition was filed, governs the question of whether absolute privilege applies to protect Siffin from this negligence claim. In applying Delaware law, this Court is bound by the decisions of the Delaware Supreme Court, and where that court has not decided the issue, this Court must predict how it would resolve that issue. See *Minn. Supply Co.*, 472 F.3d at 534 .

  "The absolute privilege is a common law rule, long recognized in Delaware, that protects from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case." *Barker v. Huang*, 610 A.2d 1341, 1345 (Del. 1992). "The purpose served by the absolute privilege is to facilitate the flow of communication between persons involved in judicial proceedings and, thus, to aid in the complete and full disclosure of facts necessary to a fair adjudication. To accomplish this goal, the privilege protects judges, parties, attorneys, witnesses and other persons connected with litigation from the apprehension of defamation suits, thus permitting them to speak and write freely, without undue restraint." *Id.* (quoting *Hoover v. Van Stone*, 540 F.Supp. 1118, 1122 (D. Del. 1982)). *See also Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 22 A.3d 710, 716, 722 (Del. Ch. 2011) (noting that the "absolute privilege to

speak freely in relation to litigation without fear of being sued for defamation is a long-standing common law rule" and that it promotes "the encouragement of candid discussions between contentious parties free from the threat of collateral lawsuits based on reputationally based torts such as defamation, libel, or intentional infliction of emotional distress").

The Delaware Supreme Court has held that this absolute privilege is not strictly limited to defamation claims, but also applies to other tort claims based on allegations that the defendant intentionally made derogatorily false statements. *Barker*, 610 A.2d at 1349. The court stated in *Barker*:

> The absolute privilege would be meaningless if a simple recasting of the cause of action from 'defamation' to 'intentional infliction of emotional distress' or 'invasion of privacy' could void its effect. *Hoover*, 540 F. Supp. 1118. However denominated, Barker's claim is that Huang intentionally made derogatorily false statements about her, and that she has been harmed thereby. To the extent that such statements were made in the course of judicial proceedings, they are privileged, regardless of the tort theory by which the plaintiff seeks to impose liability.

*Id.*

In his motion, Siffin urges this Court to read *Barker* as standing for the position that the absolute privilege applies to any statements made in the course of judicial proceedings and relevant to those proceedings, regardless of whether the statements at issue were defamatory or derogatory and regardless of the nature of the claim at issue. Siffin focuses on the court's statement in *Barker* that the privilege applies "regardless of the tort theory by which the plaintiff seeks to impose liability." Siffin's reading of *Barker* takes the quoted language out of context. As set forth above, the *Barker* court articulated the absolute privilege rule as one that "protects from actions for defamation," and then considered whether that privilege should apply in a situation where the plaintiff tried to recast a claim based on "derogatorily false statements" as a tort other than defamation. The court then said that "*such statements*"—the "derogatorily false

statements" made in the course of judicial proceedings—are privileged regardless of the specific tort theory at issue. Thus, the Delaware Supreme Court in *Barker* only slightly expanded the scope of the privilege, from situations involving defamation claims to situations involving non-defamation claims based on derogatorily false statements.

Since *Barker*, most lower courts in Delaware have continued to find that the absolute privilege is limited to situations involving defamation, derogatory or disparaging statements, or related issues. *See Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, No. CV 2018-0196-SG, 2019 WL 2319284, at *12 (Del. Ch. May 30, 2019) (noting that the absolute privilege is not limited to defamation claims and that "[i]nstead, *derogatory* statements made in the course of judicial proceedings are privileged, 'regardless of the tort theory by which the plaintiff seeks to impose liability.'") (quoting *Barker*, 610 A.2d at 1349; emphasis added); *Paige Cap. Mgmt., LLC*, 22 A.3d at 720, 724-25 (stating "[t]he policy rationale for the privilege is best served by limiting the privilege's scope to only defamation and related torts arising from derogatory statements alleged to be harmful to the suing party's reputation or psychic well-being" and noting that "since *Barker*, Delaware courts that have addressed the privilege have consistently referred to it as relating to defamation or similar torts") (collecting cases); *Bove v. Goldenberg*, No. CIV.A.05C-10-134 CHT, 2007 WL 446014, at *4 (Del. Super. Ct. Feb. 7, 2007) (noting that the absolute privilege applies to a tortious interference claim "where the substantive basis for the interference claim is the functional equivalent of defamation"); *Sinex v. Bishop*, No. CIV.A 04C-12-256MMJ, 2005 WL 3007805, at *4 (Del. Super. Ct. Oct. 27, 2005) (noting that "[t]he absolute privilege does not automatically extend to non-defamation tort claims" but finding that it applied to the claims at issue because "[t]he substantive basis for the . . . claims . . .  are all the functional equivalent of defamation"). *See also Rader v. ShareBuilder Corp*., 772 F. Supp. 2d

599, 605 (D. Del. 2011) (stating, "[t]o the extent *Barker* contemplated application of the absolute privilege to causes of action other than defamation, it appears to have been envisioning actions like defamation, i.e., actions based on a false statement"; holding that because the plaintiff had not sued the defendant for any type of false statement, the absolute privilege did not provide a basis for dismissal of the claims), *aff'd sub nom. Rader v. ING Groep NV*, 497 F. App'x 171 (3d Cir. 2012).

In this case, Trident has brought a negligence claim arising from Siffin's listing of an incorrect address in a bankruptcy filing. Trident has not asserted a defamation claim, has not attempted to recast a defamation claim as a different tort, and has not premised its claim in any way on defamation, derogatory statements, or injury to reputation. Based on the Delaware Supreme Court's articulation of the scope of the absolute privilege in *Barker*, and the bulk of the well-reasoned case law from the lower courts in Delaware, the Court predicts that the Delaware Supreme Court would not expand the application of the absolute privilege doctrine to apply in this case.

The cases cited by Siffin do not alter the Court's conclusion. *See BRP Hold Ox, LLC v. Chilian*, No. CV N18C-04-116 CLS, 2018 WL 5734648, *5 (Del. Super. Ct. Oct. 31, 2018) (applying privilege to a demand letter that formed the basis of a tortious interference claim); *AGC Networks, Inc. v. Relevante, Inc.*, No. CV 14-308-LPS, 2015 WL 1517419, *3 (D. Del. Mar. 31, 2015) (applying the privilege to a tortious interference claim based on preservation letters; stating, "The Court is not persuaded that Delaware law protects defamatory false statements but does not protect non-defamatory truthful statements that meet the other requirements for application of the absolute litigation privilege"). *BRP Hold Ox*, *LLC* appears to be distinguishable on its facts, because the court in that case noted that the demand letter that

formed the basis of the tortious interference claim was also alleged to have caused reputational harm, bringing that case closer to the traditional defamation context in which Delaware courts have applied the privilege. To the extent that either *AGC Networks* or *BRP Hold Ox* cannot be distinguished factually from the instant case, the Court finds them less persuasive than the Delaware cases discussed above, which appear more in line with the Delaware Supreme Court's holding in *Barker*. The Court also finds unpersuasive Siffin's citations to case law from other jurisdictions.

Accordingly, the Court finds that the absolute privilege does not apply here. The Court will not dismiss Count II on this basis.

### 2. Causation

Siffin next argues that Trident has not plausibly alleged that Siffin's negligence caused any injury, because Trident's causation theory rests on an unfounded legal conclusion.

Trident's causation theory is as follows. Under Texas law, the six-month deadlines for Trident to perfect its liens on the six oil wells (by filing an affidavit with the appropriate county clerk) expired between November 13, 2019, and December 1, 2019. On November 8, 2019, before Trident perfected those liens, MDC Energy filed a bankruptcy petition. At that point, Trident argues, the relevant bankruptcy law, 11 U.S.C. § 546(b), provided that for Trident to perfect its liens and become a secured creditor, it was not sufficient for Trident to file affidavits under Texas law by the November 13 through December 1 deadlines; instead, Trident needed to file a *notice with the bankruptcy court* regarding those liens by the November 13 through December 1 deadlines. *See* 11 U.S.C. § 546(b). Trident contends that because Siffin negligently listed the wrong address for Trident in its bankruptcy filings, Trident did not get notice of the bankruptcy until after those deadlines had passed. Thus, between November 13, 2019, and

November 15, 2019, Trident attempted to perfect its liens by filing mineral liens with the relevant county clerk (as required by Texas law) and *not* by filing notice with the bankruptcy court (as Trident contends was required by bankruptcy law once MDC Energy had filed for bankruptcy). Trident argues because it filed its liens with the county clerk after the bankruptcy petition was filed, and did not file notice with the bankruptcy court, its liens were not perfected and Trident was not a secured creditor in the bankruptcy.

Siffin argues that Trident's theory is based on a flawed interpretation of bankruptcy law. Siffin argues that under 11 U.S.C. § 546(b), Trident did *not* need to file a notice with the bankruptcy court before the November 13 through December 1 deadlines in order to perfect its liens and become a secured creditor. Siffin argues that Trident became a secured creditor in the bankruptcy as soon as Trident timely filed affidavits on the six wells in accordance with Texas law, with no requirement that it give notice in the bankruptcy court. Siffin argues that because Trident did not need to give notice in the bankruptcy court to perfect its liens, Siffin's incorrect listing of the address in the bankruptcy filing did not in any way cause Trident not to perfect its mineral lien rights before the time limit to do so expired.

The parties' dispute requires the Court to analyze the interaction of United States bankruptcy law and Texas property law.

a.   Relevant Provisions of the Texas Property Code

To secure a mineral lien under Texas law, "Not later than six months after the day the indebtedness accrues, a person claiming the lien must file an affidavit with the county clerk of the county in which the property is located." Tex. Prop. Code § 56.021(a).[2] Filing the affidavit in accordance with § 56.021 perfects the lien. *See Texas v. KAL Drilling, Inc.*, No. 4:07-CV-313-Y,

---

[2] Additionally, at least ten days before filing the affidavit, the person claiming the lien "must serve on the property owner written notice that the lien is claimed." Tex. Prop. Code § 56.021(b).

2009 WL 10678614, at *3 (N.D. Tex. May 11, 2009) ("To perfect a mineral lien in Texas, a mineral contractor must file an affidavit in the county where the property is located.") (citing Tex. Prop. Code. § 56.021; *Sun Coast Plumbing Co. v. Shell Offshore Inc.*, No. CIV.A. B-09-204, 2010 WL 1404371, at *6 (S.D. Tex. Apr. 7, 2010) (noting that "to perfect its lien . . . Plaintiff is required to file a lien claim affidavit in a real property records of the nearest county within six months of the last day labor and supplies were furnished") (citing Tex. Prop. Code § 56.021); *In re Rand Energy Co.*, 259 B.R. 274, 277 (Bankr. N.D. Tex. 2001) (noting that "the right to payment accrues upon the completion of services to the well" but that "the service provider has six months from that date to perfect its statutory lien.") (citing Tex. Prop. Code Ann. § 56.021).

### b.   Relevant Provisions of the Bankruptcy Code

The filing of a bankruptcy petition generally gives rise to an automatic stay of, among other things, "any act to create, perfect, or enforce any lien against property of the estate . . . ." and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(4) & (5). However, the automatic stay is subject to certain exceptions. Section 362(b)(3) provides that the automatic stay does not apply to "any act to perfect, or to maintain or continue the perfection of, an interest in  property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) . . . ." 11 U.S.C. § § 362(b)(3). *See also In re Grede Foundries, Inc.*, 651 F.3d 786, 790-91 (7th Cir. 2011) (discussing automatic stay and exceptions). In turn, Section 546(b)(1) provides:

> (1)   The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that--

> (A)    permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection; or
>
> (B)    provides for the maintenance or continuation of perfection of an interest in property to be effective against an entity that acquires rights in such property before the date on which action is taken to effect such maintenance or continuation.

11 U.S.C. § 546(b)(1). "The narrow purpose of this 'exception is to protect, in spite of the surprise intervention of the bankruptcy petition, those whom State law protects by allowing creditors to perfect an interest they obtained before the bankruptcy proceedings began.'" *In re Grede Foundries, Inc.*, 651 F.3d at 791(quoting *In re Parr Meadows Racing Ass'n, Inc.*, 880 F.2d 1540, 1546 (2d Cir. 1989)) "Stated otherwise, 'if an interest holder against whom the trustee would have rights still has, under applicable nonbankruptcy law, and as of the date of the petition, the opportunity to perfect his lien against an intervening interest holder, then he may perfect his interest against the trustee.'" *Id.* (quoting *Makoroff v. City of Lockport, N.Y.*, 916 F.2d 890, 891-92 (3d Cir. 1990)). "If the creditor has a prepetition unperfected interest in the debtor's property, this exception allows the creditor to take the steps necessary to perfect that interest because '[s]uch a *perfection* of a lien is not considered the *creation* of a lien.'" *Id.* (quoting *Makoroff,* 916 F.2d at 892 n. 1).

Section 546(b) further states:

> (2)    If—
>
> (A)    a law described in paragraph (1) requires seizure of such property or commencement of an action to accomplish such perfection, or maintenance or continuation of perfection of an interest in property; and
>
> (B)    such property has not been seized or such an action has not been commenced before the date of the filing of the petition;

> such interest in such property shall be perfected, or perfection of
> such interest shall be maintained or continued, by giving notice
> within the time fixed by such law for such seizure or such
> commencement.

11 U.S.C.A. § 546(b)(2). The legislative history regarding this provision reads, in relevant part:

> [I]f an interest holder against whom the trustee would have rights still has, under
> applicable non-bankruptcy law, and as of the date of the petition, the opportunity
> to perfect his lien against an intervening interest holder, then he may perfect his
> interest against the trustee. If applicable law requires seizure for perfection, then
> perfection is by notice to the trustee instead.

*Matter of Valairco, Inc.*, 9 B.R. 289, 292 (Bankr. D.N.J. 1981) (quoting House Report No. 95-

595, 95th Cong., 1st Sess. (1977) 371, U.S. Code Cong. & Admin. News 1978, 5787, 5963,

6327; Senate Report No. 95-989, 95th Cong., 2d Sess. (1978) 86, U.S. Code Cong. & Admin.

News 1978, 5787, 5872).

> 3. Whether § 546(b)(1) Required Trident to Give Notice to the Bankruptcy Court
> to Perfect its Liens

The parties do not appear to dispute that that Texas Property Code § 56.021(a) is a

"generally applicable law" subject to § 546(b), that this law "permits perfection of an interest in

property to be effective against an entity that acquires rights in such property before the date of

perfection" and that Trident is an entity that acquired rights in the property at issue before the

date of perfection. The parties' sole dispute concerns whether the "If" clause in § 546(b)(2)

applies. Under § 546(b)(2), "If [Texas Property Code § 56.021] requires seizure of [the] property

or commencement of an action to accomplish such perfection, or maintenance or continuation of

perfection of an interest in property," and the property has not been seized or an action

commenced before the filing of the petition, "such interest in such property shall be perfected, or

perfection of such interest shall be maintained or continued, by giving notice within the time

fixed by such law for such seizure or such commencement." 11 U.S.C. § 546(b)(2).

Siffin argues that the "If" clause in § 546(b)(2) does not apply here, because Texas Property Code § 56.021 does *not* "require seizure of [the] property or commencement of an action to accomplish such perfection." Siffin argues that under § 56.021, the only thing Texas law requires for perfection of a mineral lien is the filing of the appropriate affidavit with the county clerk—an act that is neither a "seizure" nor the "commencement of an action." Siffin argues that because Trident filed the affidavits before the relevant deadlines, the perfection was effective under § 546(b)(1), despite the fact that it was accomplished after the bankruptcy filing.

Trident, on the other hand, argues that the filing of affidavits to perfect a lien under § 56.021 is a seizure. Trident thus argues that the "If" clause in § 546(b)(2) applies, such that the only way for Trident to perfect its liens was to file a notice with the bankruptcy court no later than the November 13 through December 1 deadlines—something it was prevented from doing by Siffin's incorrect listing of Trident's address in the bankruptcy filings.

The parties' disagreement thus boils down to whether the filing of affidavits to perfect a lien under Texas Property Code § 56.021 is a "seizure" within the meaning of § 546(b)(2). The Bankruptcy Code does not define the term "seizure," and neither party has directed the Court to any cases interpreting the term in the context of the Bankruptcy Code. The Eighth Circuit has stated, "[W]hen a word is not defined by statute, . . . we normally construe it in accord with its ordinary or natural meaning." *Thompson Truck & Trailer, Inc. v. United States*, 901 F.3d 951, 953 (8th Cir. 2018)  (internal quotation marks omitted). "Ordinarily, a word's usage accords with its dictionary definition." *Id.* (quoting *Yates v. United States*, 574 U.S. 528 (2015)). *See also Union Pac. R.R. Co. v. Surface Transportation Bd.*, 863 F.3d 816, 825 (8th Cir. 2017) ("In the absence of a statutory definition, we will give a term its ordinary dictionary meaning.").

Dictionaries consistently define "seizure" as "taking possession" of something. *See*, *e.g.*,

*Merriam-Webster.com Dictionary*,  https://www.merriam-webster.com/dictionary/seizure  (last visited March 10, 2023) (defining "seizure" as "the taking possession of person or property by legal process"); *Black's Law Dictionary* (11th ed. 2019) (defining "seizure" as "The act or an instance of taking possession of a person or property by legal right or process"). *Cf. Torres v. Madrid*, 141 S. Ct. 989, 995 (2021)  ("[W]hen speaking of property, '[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'") (quoting *California v. Hodari D.*, 499 U.S. 621, 624 (1991)). "Possession," in turn, is defined as "the act of having or taking into control," or "control or occupancy of property without regard to ownership." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/possession (last visited March 10, 2023). *See also* Black's Law Dictionary (11th ed. 2019) (defining "possession" as "1. The fact of having or holding property in one's power; the exercise of dominion over property. 2. The right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object.").

Based on the above definitions, the Court does not see how the filing of an affidavit with the county clerk under Texas Property Code § 56.021 involves a "seizure" of property or the "taking possession" of any property. The filing of a mineral lien paperwork does not, on its own, appear to involve the type of taking control over property that might suggest a seizure is occurring. Moreover, the Court finds nothing in the language of the Texas Property Code to suggest that upon filing the affidavit paperwork for a mineral lien, the creditor takes possession of the property. To the contrary, another provision of the Texas Property Code implicitly acknowledges that merely filing the lien paperwork does *not* entitle the lienholder to "possession." Tex. Prop. Code. § 56.042 states:

    (a) A mineral property owner . . . may not sell property to which the lien has attached or remove it from the land on which it was to be used, unless the lienholder consents in writing.

    (b) ***On a violation of this section, a lienholder is entitled to possession of the property*** regardless of where it is found, and the lienholder may have the property sold to satisfy the debt on which the lien is based regardless of whether the debt is due.

§ 56.042 (emphasis added). The fact that the lienholder is entitled to possession of the property only after § 56.042(a) has been violated suggests that the filing the lien paperwork alone did involve "taking possession" of (i.e., seizing) the property. [3]

    Trident argues that the Court should apply a definition of seizure that has been used in the Fourth Amendment context: that "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Court is not persuaded that a definition developed in the context of the Fourth Amendment, rather than the ordinary dictionary definition, should apply in the context of bankruptcy law.[4] Regardless, the Court agrees with Siffin that even under this definition, the filing of the lien paperwork does not meaningfully interfere with the owner's "possessory" interests in the property. As discussed above, only when the owner attempts to sell the property without the lienholder's consent does the lienholder have any right to possess the

---

[3] As Siffin points out, there are state laws that *do* require a creditor to take possession of property to perfect a lien. *See, e.g., In re Gelwicks*, 81 B.R. 445, 448 (Bankr. N.D. Ill. 1987) ("Illinois law requires either actual possession or actual appointment of a receiver to perfect a security interest in rents. Therefore, pursuant to Section 546(b), a mortgagee may perfect a security interest in rents, post-petition, by giving proper notice."); *In re S. Air Transp., Inc.*, 511 F.3d 526, 533 (6th Cir. 2007) ("The [North Carolina] artisan's lien in this case requires possession, rather than filing, to be valid and retain priority against an aircraft."). Such laws would appear to fall within the "If . . . a law . . . requires seizure" clause of § 546(b)(2).

[4] For this reason, the Court is also unpersuaded by Trident's reliance on *Andrews v. Crump*, 984 F. Supp. 393, 410 (W.D. N.C. 1996) (finding a tax lien on property was a Fourth Amendment seizure).

21

property.

Trident also argues that filing a lien under Texas Property Code § 56.021 is a seizure because it results in an "attachment." To support this proposition, Trident relies on (1) the use of the phrase "property . . . to which the lien has attached" in Texas Property Code § 56.042(a), and (2) an Alabama case stating, "Attachment is a legal process which seizes and holds the property of the defendant until the rights of the parties are determined in the principal suit." *Faith Properties, LLC v. First Com. Bank*, 988 So. 2d 485, 491 (Ala. 2008) (quoting *Old Kent Bank v. Stoller*, 627 N.E.2d 265, 269 (Ill. 1993). Trident argues that because the lien was "attached," there was an "attachment" and thus a seizure.

For the reasons stated in Siffin's brief, the Court is not persuaded that the use of the phrase "to which the lien has attached" shows that the filing of the lien constitutes an "attachment" that might constitute a seizure under Texas law. Under Texas law, "A writ of attachment enables a plaintiff to secure a debt by a seizure of property before or after judgment." *In re Argyll Equities, LLC*, 227 S.W.3d 268, 271 (Tex. Ct. App. 2007). As Siffin points out, Texas has an entire body of law governing writs of attachment. "A writ of attachment may be issued in a proper case at the initiation of a suit or at any time during the progress of a suit, but may not be issued before a suit has been instituted." Tex. Civ. Prac. & Rem. Code § 61.003. *See also* Tex. R. Civ. P. 592 (noting that an application for a writ of attachment may be made "[e]ither at the commencement of a suit or at any time during its progress" and that "[n]o writ shall issue except upon written order of the court after a hearing . . . ."). Trident provides no argument to support its suggestion that the filing of an  affidavit with a county clerk to perfect a lien under § 56.021 is somehow the equivalent of this writ of attachment procedure, which involves a lawsuit and a written order of the court after a hearing. The mere use of the phrase

22

"lien has attached" in one line of the Texas Property Code is not sufficient.

For all of the above reasons, the Court finds that the filing of affidavits to perfect a mineral lien under Texas Property Code § 56.021 is not a "seizure" as that term is used in 11 U.S.C. § 546(b). Thus, the Court finds that Trident perfected its liens by filing the affidavits and was not required to file notice with the bankruptcy court in order to perfect its liens.[5]

The Court will address one additional issue related to § 546(b): whether Trident could successfully argue that even if its liens were *perfected* by the filing of affidavits, it was required to file notice in the bankruptcy court to *maintain* or *continue* the perfection of those liens, and it was prevented from doing so by the listing of the incorrect address. To the extent that Trident makes that argument, the Court finds it unpersuasive for the reasons stated in Siffin's briefs. Under Texas law, "[s]uit must be brought to foreclose [a] lien not later than the first anniversary of the last day a claimant may file the lien affidavit under Section 53.052." Tex. Prop. Code § 53.158(a). *See also* Tex. Prop. Code § 56.041(a) ("A claimant [with a mineral lien] must enforce the lien within the same time and in the same manner as a mechanic's, contractor's, or materialman's lien under Chapter 53."). Here, it is undisputed that the first anniversaries of the last days to file a lien affidavit—and thus the deadlines for filing a foreclosure suit—were in November and December 2020. It is also undisputed that Trident was aware of MDC Energy's bankruptcy filing by January 29, 2020, at the latest, when it mentioned that bankruptcy filing in the petition it filed in this case. Thus, even assuming, *arguendo*, that Texas law required Trident

---

[5] The Court notes that its conclusion is consistent with a Fifth Circuit case that, while not squarely addressing the issue presented here, found that a creditor successfully perfected a mineral lien under Texas law by filing an affidavit after a bankruptcy petition had been filed. *See In re T.S.C. Seiber Servs., L.C.*, 771 F.3d 246, 251-53 (5th Cir. 2014) (noting that "post-bankruptcy-petition perfection of liens is expressly allowed by the Bankruptcy Code" and finding that a creditor had a perfected mineral lien under Texas Property Code § 56.021 when it "filed timely its affidavit within 'six months after the day the indebtedness accrue[d]'"; not discussing the filing of a notice with the bankruptcy court).

to file a lawsuit to "maintain" or "continue" a perfected lien and that 11 U.S.C. § 546(b)(2) required Trident to file a notice with the bankruptcy court to maintain or continue the perfection of the lien, the Court finds that the deadline for filing the lawsuit (and thus the notice) did not expire until several months after Trident had notice of MDC Energy's bankruptcy filing. Thus, any failure by Trident to give notice in the bankruptcy court was not caused by the incorrect address leading to Trident not receiving notice of the bankruptcy.

### 4.   Whether Trident's Claim Survives Because Trident Was Deprived of Its Due Process Right to Notice of the Bankruptcy

Trident's final argument is that even if the Court does not accept its interpretation of §564(b), its claim survives, because Siffin's listing of the wrong address for Trident "deprived Trident of its due process right to notice." Pl.'s Resp., Doc. 40, at 13. Trident relies on cases finding that known creditors have a right to official or formal notice of a bankruptcy, even if they receive actual or constructive notice in some other way. Trident also argues that "Trident's supposed constructive notice of MDC's bankruptcy raises a factual issue of whether Trident failed to mitigate by not looking through hundreds of filings or was contributorily negligent." Response, Doc. 40, at 15.

The Court finds Trident's arguments unpersuasive. Trident has not asserted a due process claim; it has asserted a negligence claim. The issue here is whether Trident has plausibly alleged that Siffin's negligent listing of an incorrect address for Trident in the November 2019 bankruptcy paperwork caused Trident harm by preventing Trident from perfecting its mineral lien rights before the time limit to do so expired. The Court has found that, as a matter of law, Trident did perfect its mineral lien rights by filing affidavits before the time to do so expired in November and December 2019. Thus, any lack of formal notice did not harm Trident in its effort to perfect the liens. To the extent that Trident's claim is that the incorrect address and lack of

formal notice caused it not to continue or maintain the perfection by filing notice by November 2020, Trident has not plausibly alleged such a claim. Trident alleges that Siffin's conduct prevented it from "perfecting" its lien rights, not from maintaining or continuing perfected lien rights. Moreover, even if it had made allegations regarding its ability to maintain or continue its perfected lien rights, the Court finds implausible any suggestion that the failure to receive formal notice of the bankruptcy caused Trident to be unable to file a notice with the bankruptcy court given that it had at least nine months from actual notice of the bankruptcy in which to do so.

## V.   CONCLUSION

For the reasons stated above, the Court finds that Trident has stated a claim for fraudulent misrepresentation but has not stated a claim for negligence. Accordingly,

**IT IS HEREBY ORDERED** that Motion to Dismiss Second Amended Complaint for Failure to State a Claim for Relief. (Doc. 36) is **GRANTED IN PART and DENIED IN PART**. With regard to the negligence claim (Count II), the motion is **GRANTED**. With regard to the fraudulent misrepresentation claim (Count I), the motion is **DENIED**.

**IT IS FURTHER ORDERED** that Count II is **DISMISSED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of March, 2023.